# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WALTER TRIESCH, on behalf of himself and all others similarly situated,<br><br>          Plaintiff,<br><br>  v.<br><br>COLGATE-PALMOLIVE COMPANY and TOM'S OF MAINE, INC.,<br><br>          Defendants. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Case No. 25-cv-4443 |

Plaintiff Walter Triesch, on behalf of himself and all others similarly situated, bring this class action suit for damages and equitable relief against Colgate-Palmolive Company ("Colgate") and Tom's of Maine, Inc. ("Tom's," and together with Colgate, "Defendants"). Plaintiff alleges the following based upon personal information as to allegations regarding himself, and the investigation of his counsel, and on information and belief as to all other allegations:

## NATURE OF THE ACTION

1.      Defendants manufacture, market, and distribute a range of personal hygiene products, including toothpaste. Among them are Tom's of Maine Silly Strawberry Fluoride-Free Toothpaste ("Silly Strawberry") and Colgate Total Active Prevention Whitening Toothpaste ("Total Active") (together, "Products").






2.      Defendants deceptively marketed and labeled their toothpastes as safe while concealing and failing to disclose that the Products contain dangerous concentrations of lead—a known neurotoxin with no safe level of human exposure—and other, dangerous heavy metals, like arsenic and mercury.

3.     Silly Strawberry was found to contain 240 parts per billion ("ppb") of lead, and Total Active was found to contain 539 ppb of lead. Silly Strawberry also contains 40 ppb of arsenic and Total Active contains 10.4 ppb mercury. These levels far exceed thresholds considered safe by public health experts, and pose significant risks to children, adults, and pregnant individuals. Yet nowhere in advertising or the Products' packaging do Defendants inform their customers of such heavy metal content.

4.     Exposure to lead causes irreversible harm. It impairs cognitive development, reduces IQ, causes behavioral disorders and learning disabilities in children, and increases the risk of miscarriage, premature birth, and long-term cardiovascular, renal, and neurological conditions in adults. The Centers for Disease Control and Prevention ("CDC"), the American Academy of Pediatrics ("AAP"), and the World Health Organization ("WHO") uniformly conclude that no amount of lead exposure is safe.

5.     Further, arsenic and mercury are dangerous toxicants with well-documented health risks. Arsenic, a known carcinogen, impacts nearly all organ systems and has been linked to cancer, coronary disease, and neurological damage—particularly in children, where early exposure can result in learning disabilities, behavioral issues, and reduced IQ. Mercury, similarly, is recognized by the World Health Organization as one of the top ten chemicals of major public health concern due to its ability to cross the blood-brain barrier and cause significant harm to the developing brain, especially in utero and during early childhood.

6.      Despite the well-known dangers of heavy metals and the heightened duty of care owed when marketing products—especially for children's oral use—Defendants did not disclose the presence of lead, arsenic, or mercury in the Products. Nor did they warn consumers about the risk of exposure to heavy metals. To the contrary, Defendants uniformly represented that their products were safe, thoroughly tested, and free of harmful ingredients.

7.      These statements were false, misleading, and material to reasonable consumers, who reasonably expect that a child's toothpaste does not contain dangerous neurotoxins. Reasonable consumers, including Plaintiff, rely on a baseline assumption that toothpaste—especially those marketed as safe for daily use—are free from toxic substances like lead, arsenic, and mercury. The presence of such contaminants is a material fact that would have influenced any informed consumer's purchasing decision had it been disclosed.

8.      Defendants' omissions and misrepresentations deprived consumers of the ability to make informed decisions and induced them to pay a price premium for products that are, in fact, worth significantly less—or nothing at all.

9.      Defendants are powerful, well-resourced corporations with the expertise and access to ingredient sourcing and manufacturing data necessary to identify and eliminate contamination in their supply chains. They chose not to. They instead prioritized sales and brand reputation over public health and safety, spending billions on advertising while failing to disclose material facts about the contents of their Products.

10.     Accordingly, Plaintiff seeks monetary and injunctive relief against Defendants under New York General Business Law ("GBL") §§ 349 & 350 and the common law.

## THE PARTIES

11.     Plaintiff Walter Triesch is a New York resident. In 2024 and 2025, he made purchases of Tom's of Maine Silly Strawberry Fluoride-Free Toothpaste and Colgate Total Active Prevention Whitening Toothpaste.

12.     Defendant Colgate-Palmolive Company is a Delaware company headquartered in New York, New York.

13.     Defendant Tom's of Maine, Inc., is a Maine company headquartered in Kennebunk, Maine. Tom's of Maine is a majority-owned subsidiary of Colgate-Palmolive.

14.     Defendants market and advertise the Products throughout New York.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 class members are involved; and many members of the proposed Classes are citizens of different states than the Defendants.

16.     This Court has personal jurisdiction over Defendants because they committed the tortious acts alleged herein in New York, regularly conduct business in this District, and have extensive contacts with this forum. It also has personal

jurisdiction over Defendant Colgate because Colgate is headquartered in New York, New York.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant Colgate resides in this jurisdictional district and because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant transacts substantial business in this District.

## FACTUAL ALLEGATIONS

18.     Lead, arsenic, and mercury are well-documented neurotoxins that pose serious risks to public health.

19.     No level of lead exposure is safe. Even minimal ingestion can cause irreversible harm, particularly in children, including reduced IQ, attention disorders, developmental delays, and impaired academic achievement.[1] The AAP warns that "[l]ead exposure can cause serious damage to children's developing brains."[2]

20.     Lead is a cumulative toxin in bones and soft tissues, where it continues to disrupt critical biological functions long after exposure. The risk intensifies with repeated or prolonged exposure. As the Mayo Clinic warns, "Signs and symptoms usually don't appear until dangerous amounts have accumulated."[3] The CDC also states, "The effects of lead poisoning can be permanent and disabling."[4]

---

[1] https://www.cdc.gov/lead-prevention/symptoms-complications/index.html

[2] https://www.aap.org/en/patient-care/lead-exposure/?srsltid=AfmBOoo0qGQBBnUHAzuCmZReNEqngpxdsv0MsC64i3wLrQB6HbIHN4dM

[3] https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717

[4] https://www.cdc.gov/lead-prevention/about/index.html

21.     The WHO reports that "[l]ead exposure causes a significant burden of disease."[5] And according to the Environmental Protection Agency ("EPA"), ingesting lead can result in seizures, coma, and death.[6] Exposure to lead contributed to more than 1.5 million deaths in 2021.[7]

22.     Lead exposure also poses unique reproductive risks. It can impair fertility in those attempting to conceive and, during pregnancy, lead can cross the placenta and damage the developing fetus, increasing the risk of miscarriage, stillbirth, and lifelong developmental harm.[8]

23.     Arsenic, a carcinogen, "affects nearly all organ systems."[9] Exposure to arsenic "leads to various types of cancers, coronary and neurological ailments in human."[10] Further, high-level exposure during "times of active brain development" is linked to "adverse neurological effects such as learning disabilities, behavior difficulties, and lowered IQ."[11]

24.     Mercury exposure "may cause serious health problems, and is a threat to the development of the child in utero and early in life" and is "one of the top ten chemicals of major public health concern," according to the WHO.[12] Mercury can

---

[5] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health

[6] https://www.epa.gov/lead/learn-about-lead

[7] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health

[8] https://www.cdc.gov/lead-prevention/risk-factors/pregnancy.html

[9] https://archive.cdc.gov/www_atsdr_cdc_gov/csem/arsenic/physiologic_effects.html

[10] https://pmc.ncbi.nlm.nih.gov/articles/PMC8471829/

[11] https://www.fda.gov/food/environmental-contaminants-food/arsenic-food

[12] https://www.who.int/news-room/fact-sheets/detail/mercury-and-health

"penetrate and damage the blood-brain barrier very rapidly, leading to a dysfunction of the blood-brain barrier system."[13]

25.     Consumers reasonably expect their toothpastes to be free of heavy metals such as lead, arsenic, and mercury. No parent would knowingly expose their child to a product marketed as safe. Had consumers known that the toothpaste contained heavy metals, they would have paid significantly less—or not purchased the product at all.

26.     Defendants market and advertise their products as safe, clean, and appropriate for daily use. Defendant Colgate promises that "[e]very single ingredient we use is completely safe for you, your family, and the environment."[14] It goes further: "We know this because we test each one carefully, at every stage of the product lifecycle – from the development lab to the store shelf, and even to your bathroom at home."

27.     Defendant Tom's echoes these claims. It tells consumers, "We are confident there are no safety issues with our toothpaste and that it is safe to use."[15] It also assures, "We test every batch of toothpaste we make . . . to ensure its safety before it is released for sale." These representations are concrete assurances that the Products are free from unsafe substances.

---

[13] https://www.sciencedirect.com/science/article/abs/pii/0013935177900445

[14] https://www.colgate.com/en-us/mission/science-and-innovation/ingredients

[15] https://www.tomsofmaine.com/pages/the-safety-of-our-toothpaste?srsltid=AfmBOoosifJlNmTN6v7SRpGzTmIJxo0bOGu_5W-WPVJGh7Kq4dZ5VYTL

28.     Consumers depend on companies like Defendants to safeguard public health by keeping dangerous toxins out of their products. Defendant Colgate is ranked among the top 50 on Forbes' most recent list of Most Trusted Companies.[16]

29.     Defendants are aware of this trust and the impact of marketing and advertising. In 2024, Colgate-Palmolive, which calls itself "the most trusted brand in the world,"[17] spent more than $2.5 billion on advertising.[18]

30.     Yet, none of Defendants' marketing discloses that the Products contain lead or other heavy metals. No warnings appear on the packaging or ingredients list. The omission of this critical fact misleads consumers and undermines their ability to make informed purchasing decisions.

31.     Independent testing revealed that Defendants' Products contain alarmingly high levels of lead and other heavy metals, like arsenic and mercury. Lead Safe Mama, a respected consumer advocacy organization that independently tests consumer products for toxins, began testing toothpaste products in 2025.

32.     According to Lead Safe Mama's testing, Silly Strawberry contained 240 parts per billion ("ppb") of lead, and Total Active contained 539 ppb of lead. These levels far exceed the thresholds considered safe and public health authorities.

---

[16] https://www.forbes.com/lists/most-trusted-companies/

[17] https://www.colgate.com/en-us/mission/history-and-purpose

[18] https://www.statista.com/statistics/321653/ad-expenditure-worldwide-colgate-palmolive/

33.     For instance, while acknowledging that "there is no known safe level of lead in a child's blood," the EPA's action level for lead in drinking water is 15 ppb.[19] Under the Lead and Copper Rule, if more than 10 percent of tap water samples from a public water system exceed this level, the system is required to take corrective actions.[20]

34.     Some public health authorities have adopted more protective standards. For example, New York State recently lowered the action level for lead in school drinking water from 15 ppb to 5 ppb. When lead levels in school fixtures meet or exceed 5 ppb, schools must remove the fixture from service, provide free, alternate drinking water, notify the community, and take steps to remediate the issue.[21]

35.     Further, testing conducted by Lead Safe Mama found that the Products contain additional heavy metals. Specifically, Silly Strawberry contained 40 ppb of arsenic, and Total Active contained 10.4 ppb of mercury. The EPA has established a Maximum Contaminant Level ("MCL") of 10 ppb for arsenic in drinking water, stating that long-term exposure above this threshold may cause skin damage, circulatory problems, and an increased risk of cancer.[22] The EPA has set an MCL of 2 ppb for mercury in drinking water, warning that prolonged exposure above this level can lead to kidney damage.[23]

---

[19] https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water

[20] *Id.*

[21] https://www.nysed.gov/new-york-state-school-deaf/lead-testing-drinking-water

[22] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations

[23] *Id.*

36.     Defendants knew, or should have known, the formulation of their Products, including the presence of heavy metals such as lead, arsenic, and mercury. Despite their knowledge—or their duty to know—Defendants failed to test for or eliminate these dangerous contaminants. Instead, they concealed the risk and continued to market their products as safe. Defendants recklessly disregarded their duty to ensure the Products were manufactured safely, resulting in products tainted with toxic contaminants.

37.     Defendants operate sophisticated, global businesses with access to robust sourcing and quality control data. They had the ability to test for heavy metals and adopt safer formulations. They chose not to.

38.     As a resolute of Defendants' concealments and misrepresentations, consumers paid a price premium for contaminated products. The Products are worth far less—or nothing at all—because they contain known neurotoxins. Plaintiff and Class members suffered real economic harm.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action on behalf of himself and on behalf of the following proposed Nationwide Class, initially defined as follows:

> All individuals in the United States who purchased the Products within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

40.     Plaintiff also brings this action on behalf of himself and on behalf of the following proposed New York Subclass, initially defined as follows:

> All individuals in New York who purchased the Products within the relevant limitations period, and/or such subclasses as the Court may deem appropriate.

41.     Excluded from the proposed Classes are Defendants and their parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendants have a controlling interest.

42.     Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

43.     The claims of all class members derive directly from a single course of conduct by the Defendants. Defendants have engaged and continue to engage in uniform and standardized conduct toward the putative class members. Defendants do not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual class members.

44.     Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

45.     Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other business, entities, and individuals similarly situated pursuant under Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

46.     Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

47. **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Classes are each so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed each Class includes many tens of thousands of members. The precise number of class members, and their addresses, are unknown to Plaintiff at this time but can be ascertained from Defendants' records.

48. **Ascertainability.** The Classes are ascertainable because their members can be readily identified using business records, and other information kept by Defendants in the usual course of business and within their control or Plaintiff and the Classes themselves. Plaintiff anticipates providing appropriate notice to the Classes to be approved by the Court after class certification, or pursuant to court order.

49. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

(a) Whether Defendants engaged in the conduct alleged in this Complaint;

(b) Whether Defendants violated the applicable statutes alleged herein;

(c) Whether Plaintiff and the class members are injured and harmed directly by Defendants' conduct;

(d) Whether Plaintiff and the class members are entitled to damages due to Defendants' conduct as alleged in this Complaint, and if so, in what amounts; and

(e) Whether Plaintiff and the class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint

    (f)    whether Plaintiff and the Classes are entitled to actual, compensatory, nominal, statutory, enhanced, and/or punitive damages;

    (g)    whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

    (h)    whether Plaintiff and the Classes are entitled to civil penalties;

    (i)    whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

50.    **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)). The claims of Plaintiff and the putative class members are based on the same legal theories and arise from the same unlawful and willful conduct of Defendant, resulting in the same injury to Plaintiff and the putative class members. Plaintiff and all class members are similarly affected by Defendants' wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiff's interests coincide with, and are not antagonistic to, those of the other class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

51. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the class members, and he has retained counsel competent and experienced in complex class action, business competition, health care and consumer litigation. Plaintiff and his counsel will fairly and adequately protect the interest of the class members.

52. **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and class members. There is no special interest in class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation; the court system could not, given the tens or even hundreds of thousands of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

53.     **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(1) and (2)). In the alternative, this action may properly be maintained as a class action, because:

(a)     the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendants; or

(b)     the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

## FIRST CAUSE OF ACTION

### Violations of New York Gen. Bus. Law § 349
### (On Behalf of Plaintiff Triesch and the New York Subclass)

54.     Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

55.    NY GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

56.    NY GBL § 349 applies to Plaintiff Triesch and the New York Subclass because the State of New York has an interest in regulating business conduct in the region.

57.    Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to one thousand dollars per violation, if the court finds that the Defendants willfully or knowingly violated this section. The court may award reasonable attorneys' fees to a prevailing plaintiff.

58.    Defendants' marketing and promotion of the Products constitute materially misleading and deceptive business practices within the meaning of § 349. Defendants failed to disclose the presence of heavy metals—specifically, lead, arsenic, and mercury—despite representing their products as safe, clean, appropriate for daily use, and—particularly in the case of Tom's of Maine Silly Strawberry—safe for children. Defendants made express statements that "[e]very single ingredient we use is completely safe for you, your family, and the environment," and that "[w]e test each

one carefully, at every stage of the product lifecycle." Tom's assured consumers that "[w]e are confident there are no safety issues with our toothpaste."

59. These representations were false and misleading. Defendants deceptively omitted that the Products contained dangerous heavy metals, including lead, arsenic, and mercury.

60. By concealing these material facts and affirmatively representing the Products as safe and high-quality, Defendants misled consumers into believing the Products were free from harmful contaminants. A reasonable consumer would find the presence or risk of heavy metals in toothpaste—especially toothpaste intended for children—highly material to their purchasing decision.

61. Plaintiff Triesch and the New York Subclass reasonably relied on Defendants' omissions and representations in purchasing the Products. They were led to believe the products were free from harmful substances and safe for regular use. Defendants failed to disclose the presence or risk of heavy metal contamination, a fact that would have been material to any reasonable consumer.

62. Plaintiff Triesch and the New York Subclass never received the benefit of their bargain. They paid a price premium for products falsely marketed as clean, non-toxic, and safe—particularly for children—when in fact they contained elevated levels of dangerous contaminants.

63. Defendants disseminated false and misleading statements throughout New York, which were known, or which by the exercise of reasonable care should

have been known to Defendants, to be untrue and to misleading to consumers, including Plaintiff Triesch and the New York Subclass.

64.    Plaintiff Triesch and the New York Subclass have been injured by Defendants' deceptive acts or practice, suffering an ascertainable loss by paying more for products than they otherwise would have but for the false advertising.

65.    Plaintiff Triesch and the New York Subclass have no adequate remedy at law.

66.    Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff Triesch and the New York Subclass and will continue to damage both Plaintiff and the New York Subclass and deceive the public unless enjoined by this Court.

## SECOND CAUSE OF ACTION

### Violations of New York Gen. Bus. Law § 350
### (On Behalf of Plaintiff Triesch and the New York Subclass)

67.    Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

68.    By reason of the acts set forth above, Defendants have been and is engaged in consumer-oriented advertising and marketing against Plaintiff Triesch and class members located in New York, engaging in business conduct that is false and misleading in material respects, in violation of NY GBL § 350, which provides, in part, that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

69.     Defendants caused statements that were untrue or misleading, and which they knew to be untrue or misleading, to be disseminated throughout New York State and elsewhere, through advertising, marketing, and other publications.

70.     Defendants' misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers were and continue to be exposed to Defendants' material misrepresentations.

71.     Plaintiff Triesch and the New York Subclass have been injured by Defendants' deceptive acts or practices.

72.     Plaintiff Triesch and the New York Subclass have no adequate remedy at law.

73.     Defendants' conduct has caused and is causing immediate and irreparable injury to Plaintiff Triesch and the New York Subclass and will continue to damage both Plaintiff Triesch and the New York Subclass and deceive the public unless enjoined by this Court.

74.     Pursuant to NY GBL § 350-e, Plaintiff Triesch and the New York Subclass seek monetary damages (including actual damages or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to NY GBL § 350-a(1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

75.     Defendants' conduct has also substantially injured the public, as consumers across New York were exposed to and relied upon Defendants' advertising

while unaware of material omissions—specifically, the failure to disclose that the Products contained or had a material risk of containing lead, arsenic, and mercury. Defendants' omission of this critical safety information deprived consumers of the ability to make informed purchasing decisions and created a false impression that the Products were clean, safe, and suitable for families and children. This deception not only caused economic harm but undermined public trust in products that claim to be safe for everyday use.

76. Defendants' conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

## THIRD CAUSE OF ACTION

### Unjust Enrichment
### (On Behalf of Plaintiff and All Classes)

77. Plaintiff incorporates by reference all allegations in this Complaint and restate them as if fully set forth herein.

78. Plaintiff and the Classes conferred a benefit on Defendants in the form of payments for the Products.

79. Defendants accepted and retained these payments, even though it misrepresented the safety of the Products. Defendants' retention of this benefit is unjust because they knowingly marketed and sold a product containing unsafe levels of lead, while expressly representing that the Products were clean, non-toxic, and safe for daily use by families and children, and Defendants' representations were made without substantiation and in violation of the law.

80. It would be unfair for Defendants to keep the money spent without

compensating Plaintiff because Defendants misled consumers into believing the Products were safe, when in fact they were not.

81.    Defendants' conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the class members and will continue to both damage Plaintiff and the class members and deceive the public unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, pray for relief and judgment against Defendants as follows:

A.    certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Classes, and designating Plaintiff's counsel as Class Counsel;

B.    awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C.    awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D.    awarding Plaintiff and the Classes exemplary and punitive damages;

E.    awarding Plaintiff and the Classes civil penalties;

F.    granting Plaintiff and the Classes declaratory and equitable relief, including restitution and disgorgement;

G.    enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

H.    awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I.    awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

J.    awarding pre-judgment and post-judgment interest; and

K.    granting any other relief as this Court may deem just and proper.


## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 28, 2025

                        Respectfully submitted,

                        */s/ Raphael Janove*
                        Raphael Janove
                        **JANOVE PLLC**
                        500 7th Ave., 8th Floor
                        New York, NY 10018
                        Tel: (646) 347-3940
                        Email: raphael@janove.law